KEYSER, JANIS BRUSTARES, Associate Judge.
 

 Sandra Sanchez appeals a final judgment granting the father’s supplemental petition for modification of primary residential responsibility. We find that the father failed to satisfy the extraordinary burden to warrant modifying custody and, therefore, reverse the final judgment and remand with instructions to the trial court to reinstate the terms in the settlement agreement designating the mother as the primary residential parent.
 
 See Bazan v. Gambone,
 
 924 So.2d 952, 956 (Fla. 3d DCA 2006) (the parties’ acrimonious relationship and lack of effective communication do not constitute a material change in circumstances to warrant modification of custody).
 

 The father, Carlos Hernandez, and the mother, Sandra Sanchez, met while they were both members of the United States Navy. They became romantically involved and had a daughter, who was born on October 24, 2003, in Miami, Florida. A few months after the child’s birth, the parties separated. The mother relocated with the child, without the father’s permission, to live with her mother in Philadelphia.
 

 In June 2004, the father filed a petition for paternity in the Eleventh Judicial Circuit, in and for Miami-Dade County. In November 2004, the Miami court entered a Final Judgment of Paternity, which incorporated a settlement agreement, and addendum to the settlement agreement, regarding custody of the child. Pursuant to the final judgment of paternity and incorporated settlement, the mother was designated as the primary residential parent, with the parties rotating custody of the child between the mother in Pennsylvania and the father in South Florida.
 

 In December 2006, the father filed a petition for modification of primary residential responsibility in Broward County, Florida, alleging that there had been a substantial change in circumstances warranting modification of primary residential responsibility. Specifically, the petition alleged that the mother ignored her obligations to share parental responsibility with the father, unilaterally making major decisions affecting the child’s welfare, including decisions related to relocation, education, daycare and health care. The petition also alleged that the child required a more stable environment, and that it was in the child’s best interest for primary residential responsibility to be with the father.
 

 The case proceeded to trial on November 21, 2008. The court heard testimony from the father, the mother, and the guardian ad litem. The father acknowledged that he did agree in the settlement agreement that the mother would be considered the primary residential parent. The father explained, however, that the
 
 *59
 
 reason he filed the petition for modification was an “increased lack of communication” that arose since the parties entered into the settlement agreement in 2004. The father testified to an incident in October 2004 when the mother initially told him that he could not take the child, even though it was his turn to have custody of the child pursuant to the agreement. After the father told the mother that he would go to the police, the mother finally agreed that he could take the child back to Florida. However, the father acknowledged that, following the October 2004 incident, things went well between the parties up through late 2005.
 

 According to the father, the communication between the parties was “okay” until about February 2006, which is when it “started going extremely bad.” The father believed that communication deteriorated after the mother learned about the father’s fiancée, whom he later married. The father testified that when the mother had custody, he would only hear from the child two or three times a month. Whenever the father was able to speak to the child over the phone, it was only for about three or four minutes, and he would hear the mother in the background “supervising” the phone calls, which made the child nervous.
 

 The father described an incident in October 2005, when he was in New York on a flight layover and could not fly back to South Florida due to a hurricane. The father wanted to drive to Pennsylvania to see his daughter for her birthday, but the mother initially refused. The mother later agreed to let the father come see his daughter, but when he arrived in Philadelphia, the mother refused to let him see the child. The next day, the father came to Philadelphia again, and the mother did allow him to see his daughter for an hour. However, the mother explained her side of
 

 the incident, testifying that the reason she did not allow the child to see the father until the next day was because the father arrived at ten o’clock in the evening after the child had already gone to sleep. Further, this was not a denial of the father’s visitation rights pursuant to the rotating custody schedule in the settlement agreement, as the mother was to have custody of the child from September 2005 through December 2005.
 

 The father also testified to a February 2007 incident in which he had requested police assistance in enforcing his visitation rights, as the mother had told him that she was not going to give him the daughter back due to the fact that the child was enrolled in private pre-school. However, the mother testified that after she learned from the Miami judge that the current custody schedule would still be in force, she was “okay” with the father taking the minor child back to Florida. The mother explained that the father, accompanied by the police, simply made an unannounced visit to her house to pick up the child, without having contacted her or given her an itinerary beforehand.
 

 The father also complained that he learned of instances where the mother had not kept him informed regarding various medical issues with the child. For example, after the child had an accident at the airport and was taken to the hospital, the father learned from the mother, for the first time, that the child had previously dislocated her shoulder. On another occasion, the child became ill in the father’s care and had almost developed pneumonia. The father immediately called the mother, who told the father that the child had become ill like that before and that she had to be taken to the emergency room. The father was upset that the mother had not previously advised him of these facts. In another incident, the mother had taken
 
 *60
 
 the child to see a child psychiatrist. The father did not think there was a need for the child to see a psychiatrist, and when questioned by the father, the mother said she took the child because it was free through a government program.
 

 When asked whether the mother was a “fit” parent, the father testified as follows:
 

 Well, to my standards, no, she is not a fit parent. She’s a good parent. She’s a good mother to my child, to our child, but the problem that I have is not that I feel that Sandra is going to hurt Jezebel or educate her wrong. That’s not the issue. The issue is whenever she does go to Philadelphia, I feel, and there’s evidence, that I’m away from Jezebel’s life, I’m not part of her life, and that’s through communication. Even my attempts twice to go up to Philadelphia to see her is cut down by one hour.
 

 * * *
 

 I’m not saying Sandra is a bad parent to Jezebel, but when Jezebel is over in Philadelphia, I’m not part of Jezebel’s life. That’s my concern.
 

 At the trial, the father also introduced into evidence multiple e-mails between the parties from January 2007 through August 2007. In the e-mails, the mother generally expressed animosity toward the father. In an e-mail dated January 28, 2007, the mother specifically told the father that she would not allow the minor child to go to Florida for her visitation time with the father because the child was in pre-school. However, the mother also stated in that email that the father had both her cell phone and home numbers and could call to speak to the child whenever he wanted. In an e-mail dated April 12, 2007, the mother stated to the father, “please keep your money and leave me and MY DAUGHTER (that if [I] may remind you, you didn’t even want) alone.” The mother also stated: “My child is not part of your carbon copy family....”
 

 At the final hearing, the trial court also heard testimony from the guardian ad li-tem. The guardian ad litem recommended that the parents be given shared parental responsibility, with the child residing primarily with her father in Florida during the school year and returning to the mother’s home for summers and holidays. The guardian ad litem testified that the father was “very bonded with the child” and that the child was “very happy” at the father’s home, located in a school district with an A-rated school. Applying the section 61.13 criteria, the guardian ad litem opined that it would be in the child’s best interest for the father to be the primary residential parent, explaining that the father would allow the child frequent and continuing contact with the mother, but that the mother “may be less apt to allow this type of contact because of her previous inability to do so.”
 

 However, the guardian ad litem’s initial report was authored before she met the mother; in her addendum, the guardian ad litem remarked that after meeting the mother, she believed that the mother “is capable of facilitating a parent/child relationship between the child and the Father.” The guardian ad litem also stated that “since the child is now older, and now has bonded with the Father, this may no longer be an issue.” The guardian ad litem found that both parents appeared to be “morally fit” to care for their daughter, and that neither parent exhibited any mental or physical health deficiencies. In the addendum, the guardian ad litem stated that she had “never heard the Father say that the Mother was anything less than a good mother.” Nonetheless, the guardian ad litem expressed concerns about the parties’ “inability to co-parent” and reaffirmed
 
 *61
 
 her recommendation that the father he given primary custody of the child.
 

 The mother disputed the notion that she had tried to prevent the child from having a good relationship with her father. She testified: “I encourage her, and I think she is free to speak with him on a daily basis. Sometimes she doesn’t want to, for whatever reason it may be. I can’t tell you. She is five years old. She’s starting to get a little mind of her own. Other than that, I encourage her.”
 

 In the Final Judgment on Petitioner/Father’s Supplemental Petition for Modification of Primary Residential Responsibility, the trial court reviewed several of the remarks the mother made in her e-mails to the father, and found that the mother was being vindictive and was “incapable of fostering a relationship between the minor child and her father.” The final judgment also states that the e-mails from the mother “are replete with statements that cause concerns to the court for the well being of the minor child if she would continue to be in the primary residential custody of the Respondent/Mother.” Additionally, the .court stated that the contents of the emails raised “concerns regarding the emotional and mental stability” of the mother. These findings conflict with the record on appeal, which indicates that neither the guardian ad litem, nor the father, had any concern regarding the mental health, emotional stability, or fitness of the mother. Further, no testimony was presented from any psychiatric professional concerning the emotional or mental stability of the mother.
 

 The trial court also pointed to the incident where the father called the police to accompany him to pick up his daughter, as well as the October 2005 flight layover incident, finding that the mother’s actions were “indicative of frustrating the father’s access and contact to the minor child and not in the child’s best interest.” Ultimately, the trial court stated that it considered the factors set forth under section 61.13, adopted the recommendations of the court-appointed guardian ad litem, and determined that there had been a substantial and material change in circumstances warranting a modification of primary residential custody. On the basis of these findings, the trial court granted the father’s petition and designated the father as the primary residential custodian of the child.
 

 In seeking a modification of custody, the movant must show both that the circumstances have substantially, materially changed since the original custody determination and that the child’s best interests justify changing custody.
 
 See Wade v. Hirschman,
 
 903 So.2d 928, 931-32 & n. 9 (Fla.2005);
 
 Cooper v. Gress,
 
 854 So.2d 262, 265 (Fla. 1st DCA 2003). Furthermore, the substantial change must be one that was not reasonably contemplated by the parties.
 
 Wade,
 
 903 So.2d at 931 n. 2. “A decree for purposes of the substantial change test includes
 
 both a decree that has incorporated a stipulated agreement concerning child custody
 
 and a decree awarding custody after an adversarial hearing.”
 
 Wade,
 
 903 So.2d at 934 (emphasis in original). This test promotes the finality of the judicial determination of the custody of children and reflects the general belief that stability is good for children.
 
 Id.
 
 at 932. There is a presumption in favor of the reasonableness of the original decree.
 
 Id.
 
 at 933. Satisfaction of the “substantial change” test is necessary to overcome the res judicata effect of the final judgment.
 
 Id.
 
 at 934. To hold otherwise would render any rotating custody scheme in a final judgment inherently unstable.
 
 Cooper,
 
 854 So.2d at 267.
 

 The party seeking to modify a custody order bears an “extraordinary burden” to satisfy the “substantial change
 
 *62
 
 in circumstances” test.
 
 See Shaw v. Nelson,
 
 4 So.3d 740, 742 (Fla. 1st DCA 2009). Notwithstanding the movant’s extraordinary burden, a trial court’s order changing custody enjoys a presumption of correctness on appellate review and will not be disturbed absent a showing of abuse of discretion.
 
 Wade,
 
 903 So.2d at 935. However, it is well-settled that a trial court’s authority and discretion in a modification proceeding is substantially more restricted than at the time of the original custody determination.
 
 See Bazan,
 
 924 So.2d at 955.
 

 Viewed in a light most favorable to the father, the mother had difficulty communicating or cooperating with the father regarding decisions involving the child and has displayed hostility toward the father. The father, however, needed to prove more than merely an acrimonious relationship and a lack of effective communication in order to show a substantial change.
 
 See Ogilvie v. Ogilvie,
 
 954 So.2d 698 (Fla. 1st DCA 2007) (the inability of parents to communicate does not amount to a substantial change of circumstances that would justify a custody modification);
 
 Ring v. Ring,
 
 834 So.2d 216 (Fla. 2d DCA 2002) (the fact that the parties failed to communicate and had continuing hostility does not constitute a material change in custody to warrant modification of custody). Even when the custodial mother does not keep the father apprised of a child’s activities, and the father has the ability to keep himself informed, such evidence only establishes a communication problem which does not constitute a change in circumstances for the purposes of custody modification.
 
 See McKinnon v. Staats,
 
 899 So.2d 357, 360-61 (Fla. 1st DCA 2005).
 
 [1]
 

 Although the mother threatened to prevent the father from exercising his visitation rights with the child, she never actually followed through with these threats. The guardian ad litem’s report states she believed the mother “is capable of facilitating a parent/child relationship between the child and the father and that the child has bonded with the father.” If a finding of parental alienation is based upon communication difficulties between the parents, this is not sufficient evidence that the father’s visitation rights have been denied. Id at 361. In fact, the evidence demonstrates that the father was allowed to visit the child. Thus, no competent evidence was presented that the child was alienated from her father.
 

 After a thorough review of the record, we conclude the father did not meet his burden to prove a substantial material change in circumstances that would permit a change in custody. Therefore, the trial court abused its discretion in granting the father’s supplemental petition for modification of primary residential custody where the evidence presented to the trial court was insufficient to meet the extraordinary burden necessary to justify judicial intervention in the custody arrangement initially agreed upon by the parties. See
 
 Wyckoff v. Wyckoff,
 
 820 So.2d 350, 356 (Fla. 2d DCA 2002).
 

 Accordingly, we reverse the final judgment granting the father’s supplemental petition for modification of primary residential responsibility and remand with instructions to reinstate the terms of the
 
 *63
 
 settlement agreement designating the mother as the primary residential parent.
 

 GROSS, C.J., and CIKLIN, J., concur.
 

 [1]
 

 . We recognize that our supreme court has implicitly disapproved of
 
 McKinnon
 
 in part on other grounds. To the extent that
 
 McKin-non
 
 required proof of detriment in applying the “best interests” prong of the substantial change test, this aspect of the decision is no longer good law.
 
 See Wade,
 
 903 So.2d at 934.